UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel L. GRIFFITH, Defendant–
Appellant.

No. 95–2244.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1996.

Decided May 29, 1996.

Norman R. Smith, Stephen Clark (argued), W. Charles Grace, Office of the U.S. Atty., Criminal Division, Fairview Heights, IL, for Plaintiff-Appellee.

Lawrence J. Fleming, St. Louis, for Defendant-Appellant.

Before POSNER, Chief Judge, and CUDAHY, and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

For more than ten years, Defendant Daniel Griffith worked in a managerial capacity for the Hal Lowrie entertainment organization. Lowrie's organization ran a large network of nightclubs, which included country-

western clubs, topless nightclubs and, beginning in 1985, brothels ("massage parlors"). In 1993, a federal grand jury returned indictments against several persons involved with the Lowrie enterprise. In a three-count indictment, Griffith was charged with violating the RICO statute (Racketeering Influenced and Corrupt Organizations), 18 U.S.C. § 1962(c), conspiracy to violate the RICO statute, 18 U.S.C. § 1962(d), and conspiracy to commit money laundering, 18 U.S.C. §§ 1956 and 371. On February 13, 1995, Griffith entered a plea of guilty to all three charges.

On appeal, Griffith raises three issues: First, he contests the district court's denial of his motion to dismiss the money laundering count of the indictment. Second, he argues that the district court misapplied the Sentencing Guidelines in computing his sentence. Third, he disputes the district court's rejection of his motion to invalidate the Sentencing Guidelines on constitutional and statutory grounds. We affirm the district court's judgment in all three respects.

## I. Factual Background

Griffith was employed by the Hal Lowrie organization for many years. Beginning in 1985, his primary duties were as National Director of a chain of topless nightclubs known as P.T.'s. However, he maintained involvement with the "massage parlors" which are the subject of this case. Griffith lived and worked in Denver, Colorado, while the "massage parlors" were located in Illinois in the St. Louis, Missouri, metropolitan area.

In late 1985 and early 1986, though residing in Denver, Griffith directed the remodeling of one of the houses of prostitution in Illinois and helped to select its manager. Griffith also was one of five individuals who received weekly cash payments of $2000, which were skimmed from the proceeds of the prostitution operations. These cash payments were often sent via Federal Express. However, Griffith sometimes hand-carried both his own and Lowrie's shares of the skimmed cash back to Denver. Griffith knew that these funds were derived from the prostitution businesses and was aware of the way in which the finances of that business

were conducted, including the fact that the prostitutes made interstate telephone calls to secure approval of charge card payments for prostitution services.

The prostitution enterprises were aided in their endeavor to escape law enforcement efforts by widespread official corruption. Members of the Lowrie organization bribed various local government and law enforcement officials including the mayor of the Village of Brooklyn, an alderman, police officers and a state liquor control inspector. Griffith admitted in his guilty plea to having participated in the decision to pay the mayor of the Village of Brooklyn $250 per week in order to influence him not to take action against the Lowrie prostitution enterprise.

## II. Motion to Dismiss the Money Laundering Count

Griffith moved to dismiss the money laundering count on two grounds, only one of which he presses on appeal. Specifically, he contends that his conviction of money laundering required the court to make a chain of statutory linkages which was so tenuous as to render the laundering statute's application to his case constitutionally infirm. The chain of statutes invoked by the indictment leads from money laundering back to RICO and thence to the Travel Act. State prostitution offenses are predicate offenses for the Travel Act. Griffith argues that these statutes are ambiguous in their application to his conduct and, hence, that the rule of lenity demands that the money laundering count be dismissed. On appeal, Griffith adds the new argument that, in light of the Supreme Court's recent *Lopez* decision, Congress lacks the authority to punish his participation in a crime, such as prostitution, which has traditionally been a matter of local concern. *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

Returning to Griffith's statutory argument, we note that the federal money laundering statute reads, in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in

fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity;

.    .    .    .    .

shall be sentenced [to a fine or a term of imprisonment].

18 U.S.C. § 1956.

The money laundering count of Griffith's indictment alleged the use of various bank accounts in Illinois and Missouri, carrying the names of several legitimate or legitimate-appearing businesses, to handle the proceeds of the prostitution; the maintenance of various credit card merchant accounts in the same names for the same purposes; the use of interstate telephone calls to obtain approval of credit card transactions in payment for prostitution services; the use of Federal Express for the interstate transport of skimmed cash proceeds for Griffith and Lowrie in Denver; and Griffith's personal carriage of skimmed cash to Denver for his personal benefit and for delivery to Lowrie.

Griffith objects to the statutory analysis which brings his state prostitution offenses within the ambit of the "specified unlawful activity" forming the basis of a money laundering charge. The money laundering statute elaborates "specified unlawful activity" in some detail. State prostitution offenses are not among the specified crimes. However, according to the statute,

(7) the term "specified unlawful activity" means—

(A) any act or activity constituting an offense listed in section 1961(1) of this title [with various exceptions];

. . . .

18 U.S.C. § 1956(c)(7).

Turning to 18 U.S.C. § 1961(1) (which defines the predicate acts for a RICO violation), we note that the offenses listed there include "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1952 (relating to racketeering) . . . ." 18 U.S.C. § 1961(1)(B).

Section 1952 is the Travel Act, which provides:

(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

(1) distribute the proceeds of unlawful activity; or . . .

(3) otherwise promote, manage, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform [any of the acts specified in subparagraphs (1), (2), and (3), shall be fined or imprisoned].

18 U.S.C. § 1952(a). The Travel Act provides its own definition of "unlawful activity," which includes "any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed . . . ." 18 U.S.C. § 1952(b).

Griffith's state prostitution offenses, which involved the use of facilities of interstate commerce, seem to meet the definition of "unlawful activity" under the Travel Act. Travel Act violations are among the list of predicate offenses for a RICO charge. Any of these violations can, in turn, constitute the "specified unlawful activity" covered by the money laundering statute. Thus, Griffith, in using interstate facilities to conduct RICO affairs involving prostitution, and in carrying out financial transactions furthering the prostitution enterprise, subjected himself to a money laundering prosecution.

Griffith complains, however, that the indictment employed a sequence of tenuous statutory connections to convert a minor state offense into a major violation of federal law. In that respect, the breadth of the federal money laundering statute has engendered some criticism. While we have upheld convictions based on a stacking of statutes very much like that challenged here, we have voiced concern that these cases "demonstrate[ ] how an aggressive United States Attorney can use the money laundering statute as a means to take over from state prosecutors the prosecution of long-established state crimes and, in the process, secure more draconian sentences and increase the population of the already overcrowded federal prisons." *United States v. Mon-*

*tague*, 29 F.3d 317, 318 (7th Cir.1994). *See also United States v. Campione*, 942 F.2d 429 (7th Cir.1991). Thus, Griffith's complaint is not novel and has earlier evoked concern.

But, it is not our function to critique statutes—either alone or in combination. Congress, which, of course, is the statutory font, recently rejected an attempt by the Sentencing Commission to tie sentences for money laundering to sentences for the underlying criminal conduct. This approach would have reduced the sentences imposed in cases like this one. This refusal by Congress to adopt an ameliorative measure indicates an intent to impose strict punishment for money laundering, even when it is associated with relatively minor underlying offenses.

In any event, Griffith's suggestion that the money laundering statute is either vague or ambiguous as applied to the facts of this case is simply unfounded. The statutory structure involved is admittedly somewhat *complicated*—it takes three steps to get from state prostitution to federal money laundering. But complication is not tantamount to unconstitutional vagueness. Here, each step in the statutory analysis is well-defined. The link between statutes is provided by the definitions of prerequisite unlawful activity in the respective statutes. In combination, these linked statutes provide a clear path from prostitution to money laundering. When each intermediate step in an analytical chain is clear and unambiguous, the final step, though perhaps a surprise, is clear and unambiguous as well.

In this case, Griffith's involvement with the Lowrie organization exposed him to federal prosecution and this is not even surprising. Griffith's criminal activity lies near the core of longstanding congressional concerns. Congress has been concerned with the operation of interstate prostitution enterprises at least since its passage of the Mann Act, now at 18 U.S.C. §§ 2421–24, in 1910. Bribery of local law enforcement and government officials is just the sort of corruption connoted by the term "racketeering" and targeted by various federal statutes. Most pertinently, the Lowrie organization commingled funds from its legitimate and its illegal businesses and funneled proceeds of illegal activities through legitimate financial channels. This process concealed the source of the funds and coincided quite well with popular images of "money laundering." The extensive, multi-state nature of the illegal activities of the Lowrie enterprise thus suggests that the spirit, as well as the letter, of the money laundering statute was properly served in this case.

■ Further, we reject Griffith's argument that the relationship of his activities to interstate commerce is too tenuous to support federal jurisdiction under *Lopez*. One can imagine a scenario where a local prostitution offense might lack a federal dimension. Here, however, unlike the gun possession near a school in *Lopez*, Griffith's actions in their essence involved interstate commerce.

## III. Application of the Sentencing Guidelines

Griffith argues that the district court misapplied the Sentencing Guidelines. He was sentenced using a base offense level of 29 for the RICO counts. Because of the Guideline multiple-count sentencing provisions, this base offense level was actually derived from the money laundering guideline. *On the money laundering count itself*, Griffith was sentenced at the statutory maximum of five years (which was less than his sentence as finally computed at level 29). He contends that it is unfair that he should receive a sentence, calculated from the money laundering guideline, which is longer than the statutory maximum for money laundering.

■ Griffith's sentence was computed using the grouping provisions of the Sentencing Guidelines. USSG §§ 3D1.1, 3D1.2, 3D1.3. These provisions dictate the extent to which multiple convictions result in concurrent, rather than consecutive, sentences. The basic philosophy of the grouping provisions is to assign sentences based on the harm inflicted, rather than on the way in which the prosecutor framed the indictment.

■ Because all three counts of which Griffith was convicted involved "substantially the same harm" they were all appropriately

included in a single group.[1] Following the mandate of the Guidelines, the sentencing court then used "the offense guideline that produces the highest offense level" to determine the appropriate "total punishment" for all of Griffith's criminal conduct. USSG § 3D1.3. The highest offense level among Griffith's three counts of conviction corresponded to the money laundering count. Griffith's "total punishment" was based on this offense level of 29.

■ Once the total punishment has been determined according to the grouping rules, the Guidelines require the imposition of an aggregate sentence corresponding to the total punishment. The Guidelines specify precisely how the total punishment is to be allocated to the counts of conviction. Ordinarily, when a single offense level is assigned to a group of counts, "except as otherwise required by law (see § 5G1.1(a), (b)), the sentence imposed on each ... count shall be the total punishment ..." and the sentences run concurrently. USSG § 5G1.2(b).[2]

■ Because, in Griffith's case, the total punishment corresponding to offense level 29 was greater than the statutory maximum for the money laundering count, the "except as otherwise required by law" proviso was invoked. According to USSG § 5G1.1(a), "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." Following these explicit guideline instructions, the sentencing court imposed the total punishment on each of the RICO counts and the statutory maximum on the money laundering count.

The Guideline text leaves no doubt as to the correctness of this interpretation of the multiple-count sentencing provisions. The Commentary to § 5G1.2 (which is, of course, binding on the federal courts) reiterates that

"[t]o the extent possible, the total punishment is to be imposed on each count."

Griffith maintains that, in spite of this, the sentencing court's interpretation should be rejected because it "deprive[s] him [of] a sentencing limited by the statutory maximum set by Congress." Def. Br. at 27 n. 3. He argues basically that, since the offense level which dictated his total punishment originated with the *money laundering guideline,* he is, in effect, being subjected to a sentence for money laundering in excess of the statutory maximum (even though the sentence was technically imposed on the RICO counts). This argument, while seemingly plausible, is fallacious. Griffith was not convicted solely of money laundering. The sentence imposed upon him, while it corresponds to the base offense level for the money laundering count, is imposed as a *total punishment* for *all* of his criminal conduct.

The aggregate computation of this sentence as higher than the statutory maximum for money laundering follows directly from the fact that the money laundering guideline imposes base offense levels which frequently exceed the statutory maximum for the offense. As noted, Congress has explicitly rejected a recent proposal by the Sentencing Commission to reduce the money laundering offense levels to correspond more closely to those assigned to the underlying criminal activity. Since the current, relatively high offense levels come into play only when a defendant has, as here, been convicted of multiple, related offenses, one can only infer from the Congressional action that high sentences for money laundering are consistent with Congressional intent in these multiple-count circumstances.

Thus, the sentences imposed by the district court follow from a correct application of the Sentencing Guidelines, were within the statutory maximum for each offense and

---

**1.** More specifically, Counts 1 and 2 were first grouped according to § 3D1.2(a) and then that group was further grouped with Count 3 according to § 3D1.2(d).

**2.** If, as was *not* the case here, the maximum allowable penalty for the count carrying the highest statutory maximum is insufficient, sentences are to be imposed consecutively to the

extent necessary to achieve the required total punishment. USSG § 5G1.2(d). Griffith makes reference, as apparently the government did in the course of the sentencing proceedings, to this subsection. However, this subsection has no application to this case, since the statutory maximum for the RICO count was sufficient to encompass the calculated total punishment.

were, so far as we can discern, in accord with the intent of Congress.

## IV. Constitutionality of the Sentencing Guidelines as Applied to Griffith

Griffith's final argument on appeal is that the Sentencing Commission's actions in promulgating the Sentencing Guidelines are invalid in various respects: that the Sentencing Commission's actions have, in practice, violated the separation of powers; that the Commission's failure to promulgate rules for its proceedings violates the due process clause; that the Guidelines violate the bicameral passage and presentment requirements; and that the Guidelines are inconsistent with the statutory mandates which dictate the powers of the Commission.

### A. Separation of Powers

The Supreme Court upheld the Sentencing Guidelines and the Commission in the face of a separation of powers argument in *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Griffith argues, however, that the functioning of the Commission since that decision mandates that the separation of powers question be reevaluated in two respects. First, he claims that, in practice, the functioning of the Sentencing Commission has undermined its characterization as a rulemaking body within the judiciary and revealed the Commission to be a "Junior Varsity Congress." Second, he contends that the executive branch, through its prosecutors, exercises undue sway over the Sentencing Commission's activities.

### 1. The Sentencing Commission as "Junior Varsity Congress"

■ Griffith's argument that the Commission is inappropriately engaged in the promulgation of legislation is not significantly different from the proposition advanced and rejected in *Mistretta.* While Griffith seeks to distinguish his argument on the grounds that it is addressed to the actual functioning of the Sentencing Commission rather than to its inherent structure, he does not succeed in showing that there is some aspect of the current situation that would render the reasoning of *Mistretta* no longer applicable.

Griffith repeats the argument that the Sentencing Commission exercises powers properly preserved to the legislature. He does not, however, demonstrate that its exercise of legislative power is more extensive than already acknowledged by the Supreme Court in *Mistretta.* The Court was well aware, when it decided *Mistretta,* that the promulgation of Sentencing Guidelines was not entirely analogous to the promulgation of rules of procedure and, further, that the Commission's work would be "significantly political." *Mistretta,* 488 U.S. at 393, 109 S.Ct. at 666. However, the Court noted that "[o]ur separation-of-powers analysis does not turn on the labeling of an activity as 'substantive' as opposed to 'procedural', or 'political' as opposed to 'judicial.'" *Id.*

Instead, the Court based its ruling on its conclusion that "locating the Commission within the Judicial Branch pose[s] no threat of undermining the integrity of the Judicial Branch or of expanding the powers of the Judiciary beyond constitutional bounds by uniting within the Branch the political or quasi-legislative power of the Commission with the judicial power of the courts." *Id.* This conclusion was based, in large degree, on the fact that the power to determine sentences had always resided in the judicial branch and on the extent of Congressional oversight of the Commission's activities.

■ Griffith's arguments do not call into question the Court's conclusion that the Commission would not tread on the toes of the Congress. Specifically, he argues that, because the Commission has been unresponsive to the concerns of the judiciary and because Sentencing Guidelines cases now compose a substantial fraction of the federal court docket, the expectations upon which the *Mistretta* decision rested are now exposed as unrealistic. We fail to see how either of these specific criticisms advances Griffith's argument.

Griffith's argument is that the Commission (which is part of the judicial branch) is exercising *legislative* authority properly reposed

in Congress.[3] Any failure of the Commission to respond to *judicial* criticism of the Guidelines is not a separation-of-powers matter, however, since both the Commission and the Judiciary reside in the same branch. In any event, at least without further elaboration, the argument that the Commission does not respond to judicial concerns seems plainly untenable, given the fact that three of the Commission's seven members are federal judges.

The observation that federal judges now expend a substantial amount of effort interpreting the Sentencing Guidelines is true but immaterial. The thrust of this argument is apparently that the frequency with which the Guidelines are litigated reveals their importance. This is not a new insight. The sentencing decision has always been of great importance and has always been made by the judiciary. In the past, sentencing decisions were rarely litigated due to their highly discretionary nature. The frequent litigation of Sentencing Guidelines issues does not indicate that the judiciary has invaded a field formerly occupied by Congress or that Congress has improperly delegated its own legislative authority to the judiciary. Indeed, Congress now exercises *more* authority over sentencing decisions, through its ability to reject the Commission's proposals, than it did in the pre-Guidelines era.

In sum, Griffith has not succeeded in advancing any persuasive arguments for departing from the Supreme Court's prior analysis of the separation of powers issue as applied to the "legislative" power of the Commission. *Id.* at 380–97, 109 S.Ct. at 659–68.

## 2. Prosecutorial Influence on Sentencing

Griffith also argues that the executive branch, through its prosecutors, holds inappropriate sway over the Sentencing Commission, and, hence, over the judicial branch. Griffith did not raise this argument in the district court and the government argues that it is forfeited on appeal. A successful allegation of prosecutorial intrusion into the sentencing process might survive plain error review, however. In any event, though he raises an interesting and important issue,

which has been the subject of much scholarly comment, Griffith's particular arguments in this regard cannot prevail.

■ Griffith first complains that the Guidelines have, on the whole, increased the severity of criminal sentences and alleges that "the Commission has come to be widely perceived as closely identified with the Department of Justice, and as little more than an arm of that department." Def. Br. at 41. While it may be the case that prosecutors on the whole favor increased sentences, Griffith presents us with no rationale nor anything beyond a supposed public perception that links the higher sentences resulting from the Guidelines to that prosecutorial preference.

Next, Griffith points to USSG § 5K1.1, which requires a motion from the government before a downward departure for "substantial assistance to authorities" may be granted. He argues that the result of this guidelines provision is that "[w]ithout the 'permission' of the U.S. Attorney, the courts are required to apply the rigid criteria set out in the guideline manual and impose the often draconian sentences provided therein." Def. Br. at 42. However, the departure for substantial assistance is only one of a number of provisions which allow judges to depart from the rigid application of the guidelines and it is the only type of departure which the government must approve. We might agree that the Guidelines, taken as a whole, constrain the discretion to depart in an undesirable manner. However, the decision to condition a departure for substantial assistance to the government on a prosecutorial motion does not necessarily indicate undue prosecutorial influence on the framing of the Sentencing Guidelines. How else would a court determine whether a defendant had "substantially assisted" the government if not to ask the government's representative? Thus, the existence of this departure provision does not support Griffith's argument that the Sentencing Commission is dominated by the executive branch.

## B. Procedural Due Process

■ Griffith next argues that the failure of the Commission to adopt written rules and

---

**3.** He does not argue that the Commission usurps the *judicial* authority to impose sentence.

regulations governing its procedures violates due process. This argument was not specifically raised below, Griffith having raised merely a broad due process challenge and the government argues that the argument has been forfeited. In any event, the argument fails on the merits.

Griffith contends that the failure of the Commission to enact rules or regulations has allowed it to be arbitrary and capricious in fashioning the Guidelines and that he, in particular, has suffered from the Commission's failure to follow the statutory directive to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense...." 28 U.S.C. § 994(j).

■■■ Griffith's contention that the Sentencing Reform Act requires the Commission to promulgate rules and regulations governing its procedure is simply unsupported. He refers, in this regard, to 28 U.S.C. § 994(o). Nowhere does that subsection mandate the adoption of procedural rules by the Commission. As the government points out, the Commission is *authorized* to adopt such rules, 28 U.S.C. § 995(a)(1), if necessary. The Commission has apparently not found it necessary to do so. The Congressional approval requirement closely cabins the discretion of the Commission in designing the Guidelines. Thus, the Commission need not promulgate rules for its proceedings in order to provide due process.

In any event, while the Sentencing Reform Act directs that sentences other than imprisonment are appropriate for first offenders who have committed relatively minor crimes, Congress' rejection of the money laundering guideline amendment demonstrates that it apparently does not view money laundering as one of these minor crimes. Act of October 30, 1995, P.L. 104-38 (1995).

### C. Bicameral Passage and Presentment Challenges

■■■ The argument that the Sentencing Guidelines violate the Presentment Clause

has been previously rejected by this court as inconsistent with *Mistretta*. *United States v. Macias*, 930 F.2d 567 (7th Cir.1991). In light of this prior precedent, Griffith's argument on this point is patently meritless.

### D. Statutory Challenges

Lastly, Griffith argues that the Guidelines violate various statutory mandates intended to limit the Commission's discretion. These include: the requirement that the Guidelines be formulated to minimize the likelihood that prison capacity will be exceeded, 28 U.S.C. § 994(g); the requirement that first offenders who have committed relatively minor offenses receive non-prison sentences, 28 U.S.C. § 994(j); the requirement that sentences be no greater than necessary to comply with the purposes of punishment, 18 U.S.C. § 3553(a); the requirement that no limitation be placed on the information about an offender which may be considered by a court in imposing sentence, 18 U.S.C. § 3661.

■■■ As the government points out, Griffith fails to explain how he has been specifically injured by any of these alleged failings of the Commission and thus lacks standing to pursue them. The suggestion that the money laundering guideline violates 28 U.S.C. § 994(j) by not prescribing a sentence other than a term of imprisonment for cases such as his is, as already noted, contradicted by Congress' rejection of the Commission's attempts to provide lower sentences for that offense.

### V. Conclusion

In conclusion, we affirm Griffith's conviction and sentence. The district court correctly refused to dismiss the money laundering count, since the statutes involved were neither vague nor ambiguous. The court also correctly applied the grouping provisions of the Guidelines in calculating Griffith's aggregate sentence and the sentences imposed on the respective counts were proper. Finally, we reject, as inconsistent with *Mistretta*, Griffith's arguments that the Sentencing

Guidelines are unconstitutional as applied to his case.

AFFIRMED.