In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4294

United States of America,

Plaintiff-Appellee,

v.

Roman Kosmel,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 CR 40088 JJoe B. McDade, Chief Judge.

Argued October 29, 2001--Decided November 29, 2001


   Before Flaum, Chief Judge, and Posner and
Diane P. Wood, Circuit Judges.

   Flaum, Chief Judge. Appellant Roman
Kosmel represented himself during his
criminal trial for unlawfully harboring
illegal aliens, encouraging aliens to
reside unlawfully in the United States,
engaging in a pattern of unlawfully
hiring aliens, money laundering, and
engaging in transactions with criminally
derived funds. Kosmel now claims that his
choice to proceed pro se was not knowing
and intelligent. Kosmel also appeals
several sentencing rulings following the
jury's conviction. For the reasons stated
herein, we affirm Kosmel's conviction,
but remand the case for resentencing.

I.  Background

   Kosmel, a Czech citizen, entered the
United States as a tourist in April 1996.
Although authorized to remain in the
country only until October 2, 1996,
Kosmel stayed beyond the expiration of
his visa and worked as a janitor for Uni
versal Maintenance, Inc. ("Universal").
Universal provided cleaning services for
Jewel Food Stores throughout Illinois.
During his tenure as a Universal
employee, Kosmel and his wife deposited
into their personal savings account the
paychecks of other Czech citizens
unlawfully employed by Universal. During
a ten-month period, Kosmel deposited 63

checks, totaling $52,419.

Kosmel must have performed admirably at Universal because in November 1997, Universal's owner encouraged him to incorporate a floor-cleaning business called Roman Services, Inc. ("Roman"). Universal then subcontracted with Roman, which assumed responsibility for cleaning seven Jewel stores in the Quad Cities area and in Springfield, Illinois. Between November 1997 and October 1999, Roman employed approximately 40 citizens of the Czech Republic who were not authorized to work in the United States. Universal paid Roman $15,000 per month to perform the cleaning services, and Roman paid its Czech employees from these funds.

Kosmel hired his illegal employees by following a general pattern./1 Czech nationals arrived in the United States and obtained class B-2 visas./2 Czech-speaking individuals already residing in the United States then contacted the new arrivals and arranged transportation to meet Kosmel, who transported them to apartments in the Quad Cities and Springfield, Illinois. Kosmel hired the Czechs to work at Roman, paid them near minimum wage for their services, and deducted amounts for rent and occasional use of an automobile. Kosmel also became a frequent visitor to the local Social Security office, where he translated documents for his employees, filled out papers and showed office personnel their passports. While most employees received a Social Security card that read "not valid for employment," Kosmel later removed this language in an attempt to "take care of" his new employees' paperwork.

A brief example illustrates Kosmel's scheme. Jaromir Tenev arrived in Atlanta on November 19, 1998, and obtained a class B-2 visitor visa. Soon after arriving in Atlanta, a Czech-speaking man approached Tenev, offered him a janitorial job, and arranged for Tenev to travel by bus to Davenport, Iowa, all for a $500 fee. In Davenport, Tenev met Kosmel, who allowed Tenev to stay in an apartment in Silvis, Illinois. Kosmel also informed Tenev that he could arrange documentation that would allow Tenev to work lawfully in the United States. Tenev gave Kosmel his visa, and Kosmel hired

Tenev to work for Roman. Tenev earned $40 per night cleaning floors at Jewel, minus deductions for rent and other incidentals.

Kosmel opened two commercial checking accounts to conduct the financial business of Roman, one under the name "Cleaning Services, Inc." and the other under "Roman Service, Inc." Over a two-year period, Kosmel deposited 42 checks totaling $344,262 in both accounts. From these accounts, Kosmel paid a total of $107,238.50 in wages to his 40 Czech employees. Included within this amount were checks for $3,386 (drawn on the Cleaning Services account and paid to Marek Vencl) and $1,230 (drawn on the same account and issued to Petr Krhovkjak). Kosmel also used the two commercial checking accounts to make rent payments totaling $14,643 to three different landlords who owned the apartments where Kosmel stashed his Czech employees.

Kosmel did not limit his activity to the cleaning business. During his time in the Quad Cities, Kosmel arranged for several Czech women to perform as topless dancers at a local nightclub. Kosmel extorted the women, demanding between 20-40% of their earnings, plus additional compensation for airline tickets, visa "assistance," and his personal invitation to travel to the United States.

In late 1998, Kosmel became concerned about his own immigration status. Kosmel approached his neighbor's daughter, Colleen Davis, and asked her to participate in a sham marriage. In exchange for $10,500, Davis consented to marry Kosmel so he could "become a citizen" and remain in the country. The scheme unfolded as planned--Kosmel married Davis, paid her $3,500 in cash, and submitted petitions to the Immigration and Naturalization Service for a change in immigration status. Soon thereafter, the government indicted Kosmel.

In October 1999, the district court appointed the Federal Defender's office to represent Kosmel. After a brief period, Kosmel became dissatisfied, complained to the district court, and asked to proceed pro se. The district court convened a hearing, at which Kosmel

changed his mind about self-representation and instead requested new counsel. Kosmel's existing attorney explained to the court that Kosmel wanted to present fraudulent immigration documents to the jury. When the federal defender refused to go along, Kosmel initially asked to proceed pro se, but a stern admonishment from the district court led Kosmel to try his luck with another lawyer.

The district court appointed substitute counsel, and the case proceeded to trial. The court selected and impaneled a jury, gave preliminary instructions, and asked if counsel needed to resolve any remaining issues prior to opening statements. At that point, Kosmel indicated through his attorney that he wanted to participate in his own defense by questioning some witnesses at trial. The district court rejected that request and stated:

It doesn't work that way. You either represent yourself or you have an attorney represent you. You can't have it both ways. You can't represent yourself for some reasons and then let the attorney do the other things. It doesn't work that way. It's got to be one or the other. If you choose to represent yourself, I would appoint standby counsel, which means he's there to advise you.

Kosmel decided that self-representation was the way to proceed. Following a brief recess, the district judge ascertained whether Kosmel's Sixth Amendment waiver was knowing and voluntary. The district court (again) warned Kosmel about the dangers associated with self-representation. The court also instructed that Kosmel could not change his mind if he later believed self-representation was a mistake. At that point, Kosmel's attorney relayed his client's request and asked whether it was possible to continue as counsel, ". . . but should [Kosmel] decide at some point during the trial he wants to take over the case, that he could take over at that point." The court again refused and responded:

No. If you need more time to think about this I'll give you more time, but we're going to make one decision. We're not going to have this where, okay, Judge, I want to do it, but I want to wait and see

how things are going and then test the waters, and then if things are going the way I think it is, then I may want you to do it. I think you've got to decide whether or not you want to do it or you want your attorney to do it.

The district court gave Kosmel until the next day to decide, at which time Kosmel elected to represent himself. The district court appointed standby counsel to assist Kosmel. The jury ultimately convicted Kosmel on nine counts, including unlawfully harboring aliens, encouraging aliens to reside unlawfully in the United States, engaging in a pattern of unlawfully hiring aliens, money laundering, and engaging in monetary transactions with criminally derived funds.

Kosmel also represented himself during the sentencing hearing, where he filed several objections, three of which are relevant to this appeal. First, Kosmel objected to the use of the money laundering guideline because his true criminal conduct was harboring illegal aliens. Second, Kosmel objected to the amount of money that he could be accountable for laundering. Third, Kosmel objected to the addition of 2 points for obstruction of justice. In issuing this last enhancement, the district court ruled that Kosmel provided materially false information to the interviewing probation officer regarding how much money he earned conducting the scheme. The district court credited the testimony of the probation officer's supervisor, who testified because a blizzard prevented Kosmel's probation officer from traveling on the day of the sentencing hearing. The district court sentenced Kosmel to 79 months imprisonment with three years supervised release. Kosmel appeals.

II.  Discussion

A.  Standards of Review

We review de novo the district court's finding of a waiver of the right to counsel. United States v. Altier, 91 F.3d 953, 955 (7th Cir. 1996). Further, in all sentencing disputes, we review the district court's findings of fact for clear error and legal conclusions de novo. See United States v. Brown, 71 F.3d

1352, 1360-61 (7th Cir. 1995).

B.  Sixth Amendment Waiver

Kosmel first contends that the district court incorrectly characterized the law regarding self-representation, and that this misstatement misled Kosmel into waiving his Sixth Amendment right to counsel. Specifically, after Kosmel inquired about the possibility of beginning trial with counsel and then assuming control if he was dissatisfied, the district court stated:

If you need more time to think about this I'll give you more time, but we're going to make one decision. We're not going to have this where, okay, Judge, I want to do it, but I want to wait and see how things are going and then test the waters, and then if things are going the way I think it is, then I may want you to do it. I think you've got to decide whether or not you want to do it or you want your attorney to do it.

Kosmel contends that this either/or proposition prevented him from making a knowing and intelligent waiver of the right to counsel. We disagree.

While a criminal defendant's right to self-representation is well settled, Faretta v. California, 422 U.S. 806 (1975), that right depends upon the time at which the defendant asserts it. For example, if a defendant asks to proceed pro se before trial commences, then that request is absolute and must be granted. United States v. Oakey, 853 F.2d 551, 553 (7th Cir. 1988). However, once trial commences, the district court retains discretion to balance the interests of the defendant against the potential disruption of the proceedings already in progress. Id.

Here, although the district court never expressly balanced Kosmel's interests with the potential for disruption, the court's myriad discussions regarding Kosmel's self-representation had the same practical effect. The sequence of events in this case illustrates why this is so. According to his first attorney, Kosmel insisted on introducing fraudulent immigration documents and making several frivolous motions. When counsel appropriately refused to go along, Kosmel

asked for a new attorney. The district court obliged and appointed substitute counsel, even though Kosmel's first lawyer had acted competently. The new arrangement failed to please Kosmel, who subsequently asked to proceed pro se. The district court entertained this request as well, admonishing Kosmel about the dangers of self-representation. Thoroughly apprised, Kosmel decided that he wanted a lawyer, but asked if he could question some witnesses during trial. When the district court denied that request, Kosmel asked if he could "take over" if he was dissatisfied with counsel's representation.

Given the posturing that occurred here, we cannot conclude that Kosmel's waiver was anything but knowing and intelligent. Critically, nothing in the district court's comments to Kosmel indicates that the court would have precluded Kosmel from assuming control of his defense based upon a showing of good cause. Under these circumstances-- where the defendant never clearly articulated his true desire, the defendant's motivation was most likely improper, and the district court properly exercised its discretion to deny the defendant's request--the district court acted properly in trying to impose some finality on Kosmel's decision. See United States v. Moya-Gomez, 860 F.2d 706, 736 (1988) (listing the context of the defendant's decision to proceed pro se as one factor indicating a knowing and intelligent waiver of the right to counsel).

Moreover, it is not entirely clear from the record whether Kosmel wanted to "take over" entirely, or whether he wanted to engage in a prohibited form of hybrid representation, in which a defendant serves as co-counsel during the course of trial. Kosmel seems to conflate the two "rights," which is important because one is not a right at all. In fact, this Circuit clearly disfavors any form of hybrid representation, see Cain v. Peters, 972 F.2d 748, 750 (7th Cir. 1992), because "it allows a defendant to address the jury, in his capacity as counsel, without being cross-examined, in his capacity as a defendant." United States v. Oreye, 263 F.3d 669, 672-73 (7th Cir. 2001) (citing Oakey, 853 F.2d at 553). There are other systemic problems with hybrid representation,

including prolongation of the trial and allowing defendants "two bites at the apple." Id. Kosmel's indecision triggers the very same concerns, and the district court acted properly in prohibiting Kosmel from acting as co-counsel. Accordingly, we find that the district court fully and adequately informed Kosmel of his Sixth Amendment rights, and Kosmel's waiver was knowing and intelligent.

Finally, it is important to note that no case holds that an absolute right of self-representation exists after trialbegins. Rather, all of the cases cited by Kosmel reflect a rather basic principle, i.e., the district court has broad discretion in granting mid-trial requests to proceed pro se. See Oakey, 853 F.2d at 553; United States v. Noah, 130 F.3d 490, 498 (1st Cir. 1997); United States v. Stevens, 83 F.3d 60, 66 (2d Cir. 1996); United States v. Wesley, 798 F.2d 1155, 1156 (8th Cir. 1986). Here Kosmel's argument confuses necessary and sufficient conditions. Simply because the district judge has discretion to grant a defendant's request does not mean that he or she is required to do so.

C.  The Proper Sentencing Guideline

Kosmel next argues that the district court erred in sentencing him under the money laundering guideline, U.S.S.G. sec. 2S1.1. Kosmel maintains that because his money laundering activity was nothing more than a part of his scheme to harbor illegal aliens, the district court should have relied on U.S.S.G. sec. 2L1.1 (harboring illegal alien guideline). Doing so would result in a significant reduction in Kosmel's sentence. In support of his argument, Kosmel relies on two distinct sources, neither of which survives scrutiny.

The first is the introduction to Appendix A of the Sentencing Guidelines, which instructs courts deciding "atypical" cases to "use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." See U.S. Sentencing Guidelines Manual app. A (1995). While this language appears to support Kosmel's claim, his citation to the introductory language is entirely misplaced. Recently, the

Sentencing Commission deleted the entire text upon which Kosmel relies. See U.S. Sentencing Guidelines Manual app. C, amend. 591 (effective Nov. 1, 2000) ("Amendment 591"). In explaining the justification for Amendment 591, the Commission expressed concern that some courts had selected a sentencing guideline different from that listed in the Statutory Index. Instead, the Commission cautioned courts to "apply the offense guideline referenced in the Statutory Index for the statute of conviction." Id. Here, the jury convicted Kosmel of money laundering.

As a general rule, a court imposes a sentence based upon the guidelines in effect as of the date of sentencing. See U.S.S.G. sec. 1B1.11(a); United States v. Hall, 212 F.3d 1016, 1022 (7th Cir. 2000). Amendment 591 went into effect on November 1, 2000, and the district court sentenced Kosmel on December 20, 2000. Thus, Amendment 591 applies in Kosmel's case, unless "applying the version of the guidelines in effect at the time of sentencing would violate the ex post facto clause of the Constitution (e.g., if the guidelines were amended to the defendant's detriment after the offense was committed)." In such cases, the court should apply the version in effect at the time of the commission of the offense. See United States v. Booker, 70 F.3d 488, 490 n.3 (7th Cir. 1995) (citing United States v. Harris, 41 F.3d 1121, 1123 (7th Cir. 1994)); see also U.S.S.G. sec. 1B1.11(b)(1). Thus, resolution of this issue depends on whether Seventh Circuit case law allowed lower courts to decline to apply the money laundering guideline. Put another way, we must decide whether Amendment 591 effected a change in circuit law that prejudiced Kosmel.

In attempting to discern the state of this Circuit's case law prior to Amendment 591, Kosmel relies principally on United States v. Rubin, 999 F.2d 194, 196 (7th Cir. 1993). In that case, we vacated a sentence imposed under the mail fraud guideline, as opposed to the less-punitive price-fixing provision. This court reversed the sentence because "the defendants' mail fraud was directly related to the price-fixing scheme and was not a separate course of conduct." Id. at 199. Kosmel notes that several other circuits have adopted similar

reasoning and have applied it to the money laundering guideline. See United States v. Smith, 186 F.3d 290, 298 (3d Cir. 1999); United States v. Woods, 159 F.3d 1132, 1133 (8th Cir. 1998); United States v. Hemmingson, 157 F.3d 347, 361–63 (5th Cir. 1998).

While Kosmel accurately characterizes Rubin, we find it unavailing to his claim. In reversing defendant's sentence in Rubin, this court relied extensively on Application Note 13 to the mail fraud guideline, which expressly states that "where the indictment or information setting forth the count of conviction . . . establishes an offense more aptly covered by another guideline, apply that guideline rather than sec. 2F1.1."/3 There is no similar Application Note relevant to the money laundering guideline, and Kosmel's attempt to seize the introductory language of Appendix A is not an adequate proxy.

Moreover, in United States v. Buckowich, 243 F.3d 1081 (7th Cir. 2001), this Circuit expressly rejected the approach adopted by the Third and Eighth Circuits. Buckowich involved a defendant who argued that the court should disregard her conviction for money laundering and base the sentence strictly on the fraud guideline. In rejecting this argument, the court stated that the defendant "was convicted of both wire fraud and money laundering; the judge in sentencing must consider both offenses and may not act as if the defendant had been convicted of just one." Id. at 1084. See also, United States v. Griffith, 85 F.3d 284, 289 (7th Cir. 1996) ("Congress has explicitly rejected a recent proposal by the Sentencing Commission to reduce the money laundering offense levels to correspond more closely to those assigned to the underlying criminal activity."). It is clear that Amendment 591 did not alter the state of the law in this circuit. Accordingly, the proper course--and the one the district court followed--was to sentence Kosmel under the money laundering guideline.

Faced with this authority, Kosmel turns to a second source, which is a proposed amendment to the Sentencing Guidelines. The Sentencing Commission recently published on its website a proposed amendment to the money laundering

guideline and explained that the amendment would tie offense levels for money laundering more closely to the underlying criminal conduct. The proposal creates two categories for determining base offense levels. For direct money launderers (such as in this case), the sentencing court should set "the base offense level at the offense level in Chapter Two (Offense Conduct) for the underlying offense." See http://www.ussc.gov/2001guid/userfriendly2001.pdf, at 155. However, while it is true that the proposed amendment reflects a desire to tie offense levels to a defendant's underlying conduct, this Circuit affords little weight to proposed amendments, see United States v. Perez, 249 F.3d 583, 584 (7th Cir. 2001), because "proposals to amend the Guidelines do not invariably lead to amendments--they must first be promulgated and then left undisturbed by Congress--and judges must apply the Guidelines in force when a defendant is sentenced." Id. This is particularly true when Congress has rejected a similar amendment in the recent past. See Griffith, 85 F.3d at 289. Until the Sentencing Commission formally enacts the amendment, it is simply a proposal, and we decline to adopt it as the law of this Circuit.

One additional point bears mentioning. Kosmel's entire argument regarding the inapplicability of the money laundering guideline depends on the existence of an "atypical" case. However, Kosmel offers no support for why his conduct was "atypical" money laundering, other than that his conviction derived from several nominal checks drawn on his commercial checking accounts. This argument isolates two financial transactions from a much larger scheme, which involved more than $350,000 in funds derived solely from hiring illegal workers. The jury obviously believed this was money laundering in the "typical" sense because they convicted Kosmel. Wholly disregarding this particular conviction during the sentencing phase would have been improper.

D.  Money Laundering Calculation

Kosmel next argues that if the money laundering guideline applies, the district court erred in its determination

of the amount of money for which the court held Kosmel accountable. The district court added $53,000 in paychecks that Kosmel deposited in his personal bank account on behalf of Universal employees and the $344,000 that Universal paid Roman. Kosmel contends that this inclusion constituted error because the check cashing activity occurred prior to Kosmel opening Roman. Therefore, the check cashing could not have been part of the scheme to launder funds.

U.S.S.G. sec. 2S1.1(b)(2) enhances the base offense level under the money laundering guideline depending on "the value of the funds." The Commentary to sec. 2S1.1 suggests that the amount of money involved is a factor because it is an indicator of the magnitude of the criminal enterprise. Because the value of the funds is a specific offense characteristic, this Court evaluates the defendant's relevant conduct to determine the dollar amounts involved. United States v. Baker, 227 F.3d 955, 964 (7th Cir. 2000). Relevant conduct, in turn, includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. sec. 1B1.3(a)(1).

Kosmel argues that personal financial transactions cannot form the basis for money laundering convictions, let alone form the basis for calculating the "value of the funds" involved. In support of this proposition, Kosmel cites United States v. Jackson, 935 F.2d 832 (7th Cir. 1991). However, Jackson is easily distinguishable from the present case in two critical ways. First, Jackson involved a challenge to a money laundering conviction, and not the calculation of the value of funds associated with the illegal activity. The two are quite different because courts may include funds associated with uncharged instances of money laundering to determine a defendant's offense level, provided those acts are within the scope of relevant conduct under sec. 1B1.3. See Baker, 227 F.3d at 965; United States v. Sokolow, 91 F.3d 396, 411 (3d Cir. 1996). Second, Jackson involved a defendant who engaged in personal financial transactions bearing no relation to the underlying criminal conduct. See Jackson, 935 F.2d at 841 (expenditures for

personal cellular phone, rent payments and cash "maintained [the defendant's] lifestyle, but more than this is needed to establish that they promoted his drug activities.")./4

We do not agree that Kosmel's check cashing activities were purely personal financial transactions. In fact, Kosmel's two assertions that his conduct was unrelated to the illegal scheme and that he reaped no benefit from cashing employees' checks are disingenuous. It is true that Kosmel cashed the Universal employees' checks prior to opening Roman; however, the financial support Kosmel provided to the illegal workers certainly contributed to his later scheme, even if Roman's formal incorporation came later. Clearly, depositing checks on behalf of illegal aliens promotes the unlawful activity at issue here, particularly when the depositor possessed full knowledge of the illegality, later engaged in the very same practices, and used the very same employees. See Baker, 227 F.3d at 965. Consequently, all of the funds relied upon by the district court are relevant conduct as the Guidelines define that term.

Moreover, there is no basis, as Kosmel suggests, for excluding the $344,000 received from Universal. Although the government did not charge Kosmel for these transactions, they were certainly part of the scheme for which Kosmel was convicted. Accordingly, the district court's calculation did not constitute plain error.

E.  Obstruction of Justice Enhancement

Finally, Kosmel contends that the district court improperly enhanced his sentence for obstruction of justice. The district court held that Kosmel provided materially false information to Mary Seaton, Kosmel's probation officer, by allegedly misrepresenting the amount of money he earned from the illegal scheme. Although Seaton asked about earnings from his work as a laborer, Kosmel claims that she failed to ask him about any additional money he received from Universal. In support of this contention, Kosmel notes that the district court never heard testimony from Seaton, who could not travel to the sentencing hearing due to a late-term pregnancy and

a substantial snowfall. Instead, Valerie Martin, who is Seaton's supervisor, testified. Martin stated that Seaton probably did not ask Kosmel about the payments from Universal because they had not learned of them at the time of Seaton's initial interview.

Under U.S.S.G. sec. 3C1.1, a district court may enhance a defendant's sentence if "the defendant willfully obstructed or impeded . . . the administration of justice during the course of the investigation, prosecution, or sentencing" of the defendant. Providing a materially false statement to a probation officer with respect to a presentence report can form the basis for the obstruction enhancement. See sec. 3C1.1, n.4 (h) (2000); United States v. Garcia, 69 F.3d 810, 817 (7th Cir. 1995). However, in cases of allegedly false responses, the district court must determine whether the defendant specifically intended to obstruct justice or whether a potentially misleading answer derived from "confusion, mistake or faulty memory." United States v. Gage, 183 F.3d 711, 715 (7th Cir. 1999) (citing United States v. Dunnigan, 507 U.S. 87, 94 (1993)).

The problem in this case is that the record does not reveal whether Kosmel's allegedly misleading statement was "willful" because Seaton never testified about what she asked Kosmel. See Jackson, 935 F.2d at 849. There must be some evidence in the record to support the district court's ruling enhancing Kosmel's sentence. United States v. Ewing, 129 F.3d 430, 434 (7th Cir. 1997) ("Section 3C1.1 requires specific intent to obstruct justice."). Due to unforseen circumstances, the record is bereft of such evidence. Accordingly, we vacate the obstruction of justice enhancement andremand to the district court to ascertain the precise nature of Seaton's interview with Kosmel./5

III.  Conclusion

While we AFFIRM Kosmel's conviction and the balance of his sentence, on the record before us there is an absence of evidence to support the district court's two-point enhancement for obstruction of justice. For the foregoing reasons, we REVERSE that aspect of the district

court's sentence and REMAND this case for proceedings consistent with this opinion.

FOOTNOTES

/1 Although the government presented evidence of at least five Roman employees at trial, we will describe generally Kosmel's practice of hiring illegal aliens.

/2 Class B-2 visas are issued to visitors who are in the United States for pleasure. The government does not permit B-2 visa holders to work while in the United States.

/3 The current Guidelines Manual has an identical provision, which is now labeled Application Note 14.

/4 Moreover, contrary to Kosmel's assertion, the Jackson court ultimately affirmed the defendant's money laundering conviction. The money laundering statute protects against two distinct forms of laundering--promotion and concealment, see Jackson, 935 F.2d at 842, and the court held that the defendant concealed assets by turning cash into goods. In this case, we need not address whether Kosmel's activity constituted concealment under 18 U.S.C. sec. 1956 (a)(1)(B)(i) because the government concedes that Kosmel's money laundering promoted the underlying criminal conduct.

/5 The result in this case is probably inevitable. The district court engaged Kosmel in a rather lengthy colloquy regarding whether he told Seaton that he was just a laborer earning $40-$50 per day. Kosmel provided evasive answers and never satisfactorily answered the court's question. Moreover, it is difficult to fathom any question where Kosmel's answer concerning his compensation ($40-$50 per week as a laborer) would be truthful, unless Seaton somehow limited her inquiry to Kosmel's first few weeks at Universal.