In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 15-1899 & 16-2432

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM J. MABIE,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Southern District of Illinois.
No. 14-CR-30076 — **Michael J. Reagan**, *Chief Judge.*
No. 15-CR-30158 — **Richard Mills**, *Judge.*

ARGUED FEBRUARY 24, 2017 — DECIDED JULY 7, 2017

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* This consolidated appeal involves two criminal cases from the Southern District of Illinois. In the first case—which we call the "threat case," numbered 15-1899 on appeal—William Mabie was convicted of sending threatening letters through the mail. In the second case—which we call the "assault case," numbered 16-2432 on appeal—Mabie was convicted of assaulting a deputy United

States marshal. Mabie received lengthy prison terms in both cases.

Mabie brings multiple challenges on appeal. Specifically, he contends that, in the threat case, the district court improperly admitted evidence under Federal Rule of Evidence 404(b). He also argues that, in the assault case, the district court erred by refusing to allow him to proceed *pro se* and by forcing him to attend trial after he had waived his right to be present in the courtroom. Finally, he claims that he received unreasonable sentences in both cases. We reject these arguments and affirm Mabie's convictions and sentences.[1]

## I.   BACKGROUND

Mabie received 340 months' imprisonment for his crimes—crimes that involved speech and letters riddled with scurrilous language directed at state and federal officials and their families. Throughout this opinion, we repeat his language to highlight the severity of his crimes and to illustrate why the district judges who sentenced him felt compelled to imprison him for what may be the better part of his life.

We start with some background facts involving a prior conviction Mabie received in the Eastern District of Missouri for threatening a police officer. Although that conviction is not before us, the facts underlying it are necessary to provide context for the convictions and sentences subject to this appeal.

---

[1] Citations to the record of the threat case are abbreviated "R1." Citations to the record of the assault case are abbreviated "R2."

*A. The Eastern District of Missouri Case*

We begin in 2007 in St. Louis, Missouri. Then and there, Mabie worked as an auto-body repairman, renting space from Steven Reisch at Reisch's business called Affordable Auto. In August 2007, the two had a falling out, causing Mabie to look for new space to rent. Because Mabie had paid his rent through the end of the month, he left his work equipment at Affordable Auto as he conducted his search.

At some point, Mabie's equipment—purportedly worth $25,000—was stolen in a burglary. Reisch reported this burglary to the St. Louis Metropolitan Police Department. Officer Joshua Wenstrom and others investigated, but they were unable to identify the thief or uncover other incriminating evidence. Thus, much to Mabie's chagrin, the police department cancelled the investigation and put the case on inactive status.

Paranoia ensued. Mabie became convinced that Reisch was in on the burglary. Mabie contacted Officer Michael Deeba, whom Mabie had met before: Deeba was one of Reisch's customers who occasionally had work done on his cars at Affordable Auto. Mabie was frustrated with Wenstrom's inability to solve the case, so he wanted Deeba to investigate. But Deeba declined to help because he was a SWAT commander who did not investigate property crimes and because he knew Reisch through business dealings and did not want to create a conflict of interest.

Because Deeba refused to investigate, Mabie concluded that Deeba too was in on the burglary. Between May and August 2008, Mabie called Deeba numerous times and left him several voicemail messages. In one message, Mabie

called Deeba a "prick eater" and accused him of taking kick-backs. (R1. 216 at 66.) In another message, Mabie said, "I think somebody should check on [Deeba]. He might be up in his office hanging himself or committing suicide. I mean, I don't know that would be a bad thing, but maybe you should check on him." (*Id*. at 67.)

It got worse from there: the messages grew darker and showed Mabie growing angrier as time went on. For instance, in one message, he said,

> [W]here's this investigation fag? Come on you gut-less son of a bitch. Let's have the investigation and find out what a crooked cock sucker you are and what a thieving bunch of crooked bullshit operation Affordable [Auto] is … . See ya Mikey."

(*Id*. at 72.) And in another message, Mabie commented that the next day was Deeba's deceased uncle's birthday, and concluded, "Funny how I know things like this, isn't it? Have a super day. See you in Greenville." (*Id*. at 68.) Deeba lived in Greenville, Illinois.

Mabie was also able to reach Deeba at the police station. During one call, Mabie told Deeba, "Why don't you have your wife suck my dick and we'll be even." (*Id*. at 70.)

Deeba wasn't Mabie's only target: Mabie also sent numerous letters to Officer Wenstrom, accusing Wenstrom of conducting a shoddy investigation. Wenstrom received a final letter in May 2013—almost six years after the burglary. That letter stated,

> Dear Josh, I know you are used to things being up your ass, [Officer] Anderson['s] tongue, Deeba's fist[,] [Reisch's] cock, but what of something not so

tangible like 07-078733.[2] Yes, yes, that was a while ago. As I sit here as direct link to your never getting of your ass, I'm still concerned. In fact, I do not have a statute of limitations. … But wait, could it be you did not want to catch Reisch? AUSA says the DEA is well aware of what goes on at 4108 Hoffmeister and a Freedom of Information request to DEA, they will not deny Reisch assistance. Hmm. … I don't give a fuck if he's the best snitch out there. I want my property. … Well, asswipe, check this. Reisch can make reparation now, 25K for Sable, S A B L E, 25K for equipment, 25K for lawyer fee and the rest can quit lying or I deal with every lying maggot all the way through.

(*Id*. at 35–37.)

Eventually, internal affairs opened an investigation. On June 18, 2008, Officer Al Klein called Mabie. During that conversation, Mabie claimed that Deeba challenged him to a gun fight, which Mabie said would end badly for Deeba. Specifically, Mabie claimed that he "can hit what [he's] aimin' at from 400 fuckin' yards" and even went so far as to comment on how blue Deeba would look if Deeba were dead. (R1. 214 at 59.)

Shortly after, Officer John Anderson of the intelligence division began investigating to determine whether Mabie posed a credible threat to Deeba. On July 29, 2008, Anderson warned Mabie to stop threatening police officers. But Mabie persisted. On August 4, 2008, Mabie called Officer Anthony Brooks of the Greenville Police Department, claiming that Deeba challenged Mabie to a gun fight and that Mabie was

---

[2] This was the complaint number on the burglary-investigation report.

"up for it." (*Id*. at 133.) Mabie further commented that St. Louis police officers think a gun fight is at 15 yards, but Mabie was good from 300 yards. After this call, Deeba asked the Bond County Sheriff's Office to patrol his property in Greenville. The sheriff's office complied with this request.

After Anderson learned of Mabie's call to Brooks, Anderson called Mabie again. During their conversation, Mabie explained that he had an M1, a 30 aught 6, and a 30 aught 8; he claimed that he could shoot and hit Deeba at 600 yards with these guns.

Police officers arrested Mabie on August 4, 2008. At that time, he was living at his sister's house in Festus, Missouri. The officers searched the house. Although they did not find any weapons, they found a map to Greenville along with some Google Earth photos of the town. They also found a letter on Mabie's printer. The letter was addressed to Deeba's wife Deborah and purported to be from Reisch's wife Kim. Deborah received a copy of this letter, which read,

> Dear Debbie, As you know, your crooked piece of crap husband (Lieutenant Michael Deeba) and Thieving pothead husband (Steve Reisch) have quite an enterprise what with Steve paying kickbacks to Mike so he can do every crooked low life thing that there is. As you may have heard, Steve and Mike are trying to muscle Bill Mabie out of his equipment. Already stole one car and working on stealing a '67 Camaro. One little problem, Bill Mabie knows about their arrangement. And Mikey and Steve's employees made the mistake of challenging him to a gun fight. Given SLMPD … record of poor marksmanship, the neighbor must be warned. (Don't worry, I'll let everyone possibly

> know what is coming.) It might be best if you move. I know you think why not just give it back. What would be the point of being a scumbag cop if you acted legally. Sincerely, Kim Reisch. P.S. Good luck with the federal investigation.

(R1. 216 at 84.)

The government charged Mabie in the Eastern District of Missouri with three counts of mailing threatening communications in violation of 18 U.S.C. § 876(c) and one count of interstate communication of a threat in violation of 18 U.S.C. § 875(c). The government used the above facts as evidence at Mabie's trial. In December 2008, a jury convicted Mabie of the charged crimes. *See United States v. Mabie*, 663 F.3d 322, 328 (8th Cir. 2011). The court sentenced Mabie to 88 months' imprisonment. As the officers escorted Mabie out of the courtroom, Mabie yelled, "[F]uck you, Deeba, I'm gonna get you." (R1. 216 at 90.)

### B. The Threat Case (15-1899)

Apparently undeterred by an 88-month sentence, Mabie continued sending threatening letters, doing so from prison. One letter, dated January 29, 2012, was to Sheriff Jeff Brown of Bond County, Illinois. At Mabie's sentencing hearing in the Eastern District of Missouri, the government introduced an email from Brown in which he claimed that police officers had spent roughly 210 to 220 man hours searching and patrolling Deeba's property in response to Mabie's threats. In Mabie's letter to Brown, Mabie questioned the legitimacy of Brown's accusation and threatened Brown. Specifically, Mabie wrote,

> 220 hours? How about 5 minutes of legitimate investigation – of 07-078733 ALL I'VE EVER

> ASKED.....NOPE. Because it would no doubt send your boy + Reisch (UNDISPUTABLE BOGUS REPORT) to prison – MUCH EASIER TO COME AFTER ME, except.........what happens when I'm released – OH NO!! and seek justice – please, please NOT THAT! I asked [United States Attorney Richard] Callahan [of the Eastern District of Missouri] if he would prosecute all you lying cocksuckers, or if he preferred kick your teeth in – NO RESPONSE Could be all you maggots should look for a dentist – GROUP RATES[.]

(R1. 106-1 at 5.)

Mabie sent two additional letters to Deeba's wife Deborah. In the first letter, dated January 21, 2012, Mabie accused Deeba of misconduct. Regarding that conduct, Mabie wrote,

> I asked Richard Callahan – US ATTORNEY if he preferred to prosecute, or have these people's teeth kicked ~~in~~ down their throat—WELL, have you seen anyone prosecuted lately? ME EITHER. So there will be justice done.

(R1. 106-2 at 3.)

In the second letter, dated March 11, 2013, Mabie again accused Deeba of misconduct. Mabie also suggested a *ménage à trois* with him, Deborah, and the wife of a deceased St. Louis police officer whom he (erroneously) assumed Deborah knew. He sent this letter using a stamp depicting a Purple Heart. Regarding that stamp, he concluded his letter by writing,

> P.S. Did you notice the stamp? Ya know, my dad got a purple heart, actually eligible for 3. Did he do that, come back so that Reisch could steal his chain

> come along, threaten his son's life, have the US
> ATTY lie so Reisch can get away with it? probably
> not. If you think the old boy fought hard, wait till
> you see the length I'll go to, to get his property
> back.

(R1. 106-3 at 5.)

On April 23, 2014, the government obtained a three-count indictment against Mabie in the Southern District of Illinois, charging him with mailing threatening communications in violation of 18 U.S.C. § 876(c). The case was assigned to Chief Judge Reagan.

Later, on October 22, 2015, a grand jury returned a superseding indictment, adding to each count of the original indictment the allegation that Mabie mailed the threatening communications "with intent to convey a threat to injure the person of another." (R1. 132.) Through this superseding indictment, the government acknowledged that a § 876(c) violation is a specific-intent crime.

To prove the specific-intent element, the government sought to introduce under Rule 404(b) some of the evidence at issue in the Eastern District of Missouri trial. This evidence included Mabie's voicemail messages to Deeba; Mabie's recommendation that Deeba have his wife Deborah perform oral sex on Mabie; Mabie's letter to Officer Wenstrom; Mabie's calls to Officers Klein, Brooks, and Anderson; Mabie's letter to Deborah purporting to be from Kim Reisch; and Mabie's "I'm gonna get you" statement to Deeba after the sentencing hearing.

The purpose of introducing this evidence was to provide background and context to the charged conduct and to show

Mabie's knowledge and motive in making true threats. The court admitted this evidence over Mabie's objection.

The trial lasted four days. Mabie proceeded *pro se* through pretrial and the first day of trial. During the second day, at the court's urging, Mabie agreed to have standby counsel step in. In the end, the jury convicted Mabie on all counts.

On April 3, 2015, Judge Reagan sentenced Mabie to the statutory maximum—60 months' imprisonment—on each of the three § 876(c) counts for a total of 180 months. This sentence not only exceeded the sentencing guidelines recommendation but also was set to run consecutively to the 88-month sentence Mabie received in the Eastern District of Missouri. Judge Reagan acknowledged that this sentence was "a breathtaking departure" from the guidelines recommendation and that he had never imposed a statutory-maximum sentence before. (R1. 251 at 115.) Even so, after taking into account the trial evidence and additional evidence of noncharged bad acts—including Mabie's assault of Deputy Marshal Berry—the court determined that an above-guidelines sentence was warranted.

C. *The Assault Case (16-2432)*

On March 12, 2015, Judge Reagan held a hearing to address Mabie's motion to proceed *pro se* during sentencing in the threat case. After the hearing, Mabie met with standby counsel in one of the interview rooms. When counsel left, Mabie remained in the room. A couple of hours passed, and Mabie became agitated. So he started kicking and banging on the door. Eventually, Deputy United States Marshal Don Berry moved Mabie to a holding cell with another detainee.

As Berry turned to walk away, Mabie called him a "punk ass" and spat on him. (R1. 251 at 48; R2. 100 at 85.)

At that point, Berry deemed Mabie to be a threat to the other detainee. So he called over two other deputy marshals to move Mabie to a different cell. As the deputy marshals attempted to do so, Mabie got into a fighting stance with "his fists clenched and head down." (R2. 100 at 86.) When Mabie stepped forward, breaking the plane of the cell door, Berry punched him. Consequently, Berry injured his hand; Mabie suffered facial wounds.

On October 20, 2016, the government obtained a second indictment against Mabie in the Southern District of Illinois, charging him with one count of forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with a United States officer in violation of 18 U.S.C. § 111(a)(1). The case was assigned to Judge Mills.

Mabie proceeded *pro se* for most of pretrial, but he eventually asked the court to appoint counsel. The court acquiesced to this request. Later on, after jury selection and opening statements, Mabie became frustrated with his counsel and demanded to proceed *pro se* for the rest of the trial. The court denied this request, concluding that the appointed attorney would continue to represent Mabie.

Mabie then said that he was going to leave the courtroom and that the trial could proceed without him. The court denied this request, too, ordering Mabie to remain in the courtroom during trial.

But Mabie's presence at trial was short-lived: Mabie went on a tirade during the government's first witness's testimony, causing the deputy marshals to remove him from the

courtroom. Mabie was then excused for the rest of the trial, except that he returned briefly to testify. During that testimony, Mabie explained that, upon his release, he would "hunt down" Berry, "handcuff him," and "return the favor." (R2. 102 at 99.) And by "return the favor," Mabie meant,

> I'm going to beat the shit out of him … . [T]hat's going to be a hell of an assault. I may just kill the bastard. How do you like that? Under oath. How about tying him to the bumper and drag his ass around … .

(*Id*. at 99-100.)

The jury convicted Mabie. Mabie requested a new trial, arguing that, because he was forced to attend his trial on the first day, he engaged in bad conduct that prejudiced him. The court acknowledged that Mabie's conduct was prejudicial, but not unfairly prejudicial given that Mabie was capable of "behaving in a manner that respects the decorum of the courtroom and the legal process" but he "chose not to behave in such a manner in front of the jury." (R2. 101 at 2.)

On June 9, 2016, Judge Mills sentenced Mabie to 72 months' imprisonment. Like the sentence in the threat case, this sentence exceeded the sentencing guidelines recommendation. Moreover, the court ran the sentence consecutively to Mabie's sentences in both the threat case and the Eastern District of Missouri case. The court explained that this was necessary; "otherwise it would almost be like [Mabie] isn't even being punished for this offense. That would be an egregious result given Mr. Mabie's lack of remorse and continued threats, including the threats to kill a Deputy U.S. Marshal." (R2. 130 at 38.)

\* \* \*

Mabie has appealed both his convictions and sentences.

## II.   ANALYSIS

Mabie raises several issues on appeal. He first argues that, in the threat case, the district court improperly admitted Rule 404(b) evidence. He next contends that, in the assault case, the district court erred by denying his requests to represent himself and by forcing him to attend his own trial. Finally, he claims that his sentences in both cases were unreasonable. We address each issue in turn.

### A.  Admission of Rule 404(b) Evidence (15-1899)

In the threat case, the government charged Mabie under 18 U.S.C. § 876(c), which provides that whoever sends mail to another person that threatens to injure that person shall be guilty of a crime. On October 22, 2014, the government obtained a superseding indictment, adding a specific-intent element to the original charges. In so doing, the government conceded that § 876(c) is a specific-intent crime, requiring proof that Mabie sent his letters "for the purpose of issuing a threat, or with knowledge that the communication [would] be viewed as a threat." *See Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015) (considering 18 U.S.C. § 875(c)); *United States v. Crawford*, 665 F. App'x 539, 541 (7th Cir. 2016) (noting that *Elonis* applies to § 876(c), too).

As noted earlier, to prove Mabie's intent to issue threats, the government sought to introduce under Rule 404(b) some of the evidence offered in the earlier Eastern District of Missouri trial to provide background and context for Mabie's

crimes.[3] Indeed, the government's stated purpose for introducing this evidence was "to explain the nature of the dispute between [Mabie] and Reisch and Deeba that has led to the charges in" the indictment. (R1. 18 at 8–9.) On appeal, Mabie contends that the district court improperly admitted this evidence.

We have held that, depending on the case, background and context evidence may be relevant to proving intent to convey a threat. *See United States v. Parr*, 545 F.3d 491, 501 (7th Cir. 2008). That certainly is the case here. Consider Mabie's letter to Sheriff Brown, in which Mabie wrote,

> 220 hours? How about 5 minutes of legitimate investigation – of 07-078733 ALL I'VE EVER ASKED.....NOPE. Because it would no doubt send your boy + Reisch (UNDISPUTABLE BOGUS REPORT) to prison – MUCH EASIER TO COME AFTER ME, except………what happens when I'm released – OH NO!! and seek justice – please, please NOT THAT! I asked [United States Attorney Richard] Callahan [of the Eastern District of Missouri] if he would prosecute all you lying cocksuckers, or if he preferred kick your teeth in – NO RESPONSE Could be all you maggots should look for a dentist – GROUP RATES[.]

---

[3] Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). It does, however, allow this evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). This is not an exhaustive list. *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir. 2008).

(R1. 106-1 at 5.) Without context, this letter and the threat imbedded in it make no sense. To what does 220 hours refer? Why has Mabie allegedly been deprived of an investigation of 07-078733? What does 07-078733 even mean? Who is Reisch? Why is he Sheriff Brown's boy? Why does Mabie need to seek justice? And who are the "lying cocksuckers" and "maggots" that Mabie speaks of? To make sense, we need the evidence from the Eastern District of Missouri trial, which provides answers to these questions.

Mabie admitted as much during pretrial, conceding that "we do have to have some background in there or the jury won't even know. Basically the content is the context so they'll have to have something." (R1. 221 at 53.) Thus, the admitted evidence was necessary for the government's case.

What remains is whether the district court admitted this evidence through the proper procedure. Our opinion in *United States v. Gomez* establishes that procedure. 763 F.3d 845 (7th Cir. 2014) (en banc). There, we held that, to overcome an objection to Rule 404(b) other-act evidence, "the proponent of the evidence must first establish that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way." *Id*. at 860. This does not mean, however, that evidence is excluded whenever a propensity inference is possible. But in such a case, the relevance of the evidence to a proper purpose "must be established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case." *Id*. Moreover, if and when the proponent makes this showing, the district court must then "assess whether the probative value of the other-act ev-

idence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great." *Id*.

There is no credible argument that the government failed to comply with *Gomez*'s requirements. As the proponent of Rule 404(b) evidence, the government began by filing two notices identifying the evidence it sought to admit.

The government then filed a detailed, 32-page memorandum explaining that the purpose of the evidence was to provide background and context and to prove knowledge and motive. Regarding background and context, the government asserted that the evidence was necessary to explain why Mabie's letters to Sheriff Brown and Deborah Deeba constituted true threats: as shown above, without this evidence—which showed Mabie's frustration over the failed burglary investigation and his animosity toward Deeba and many others—the letters for which the government charged Mabie would lack meaning. Regarding knowledge, the evidence showed that Deeba knew Reisch, which was necessary for Mabie to draw the conclusion that Deeba and other police officers were incentivized not to investigate the burglary. And regarding motive, the evidence revealed that Mabie sent letters as an attempt to get his tools back.

The government's memorandum also rejected the notion that the evidence was offered for propensity purposes—essentially, that Mabie has a knack for threatening people. But insofar as one could draw that propensity inference, the government argued that, under Rule 403, the resulting prejudice did not substantially outweigh the evidence's probative value—which, as noted above, was extremely high.

The government contends that its memorandum linked all of the evidence to a proper, nonpropensity purpose, which complies with *Gomez*'s "chain of reasoning" language. We agree and hold that the government met its burden under *Gomez*.

For its part, the court too complied with *Gomez*. During a pretrial conference, the court instructed Mabie to read *Gomez*, which had issued the week before. The court then called for a hearing on the admissibility of the evidence in light of *Gomez*. At that hearing, the court indicated that, irrespective of the government's detailed memorandum on admissibility, *Gomez* still required the court to conduct a Rule 403 balancing test, weighing probative value and resulting prejudice against each other.

The court then invited Mabie to respond. Mabie objected to the evidence on relevancy grounds. He also claimed that "the sheer volume" of the evidence would confuse the jury. (R1. 219 at 7–8.) But at no point did he argue that harm of admitting the evidence would substantially outweigh its probative value.

The court decided to admit the Rule 404(b) evidence. In so doing, the court acknowledged that it looks upon Rule 404(b) evidence "with a jaundiced eye," but sometimes, such evidence is appropriate. (*Id*. at 8.) Even so, the court held that Mabie was free to make specific objections at trial. And in accordance with *Gomez*, the court agreed to apply an appropriate limiting instruction.

At trial, the court imposed a limiting instruction applicable to each witness offering Rule 404(b) testimony. Specifically, the court instructed the jury that it could not infer from

the government's evidence that Mabie is a bad person or has the propensity to commit crimes; instead, to the extent that the jury was to consider this evidence, it could do so only for a proper purpose, like background, context, knowledge, and motive.

Finally, at the end of the government's case, the court gave the jury an evidence-rules "tutorial." Regarding Rule 403, the court explained that, "even though some evidence can be relevant, I can still exclude it if the probative value is substantially outweighed by the prejudicial effect. In other words, even though it might be relevant, it is just too prejudicial and you might not be able to get past it." (R1. 214 at 141.)

What's missing from the record, as Mabie points out, are specific findings from the court that the evidence fulfilled a nonpropensity purpose and that the prejudicial effect of the evidence did not substantially outweigh its probative value.

Even so, it's clear from the record that the court conducted the proper analysis. From the get-go, the court had *Gomez* on its mind: the court instructed Mabie to read *Gomez*; the court held a *Gomez* hearing; and the court agreed to give a limiting instruction at trial in light of *Gomez*. Moreover, the court had read the government's 32-page memorandum, which established a chain of reasoning linking the evidence to a nonpropensity purpose. The court invited Mabie to respond to this filing, yet Mabie made no objection on prejudice grounds. Still, the court explained numerous times that the government's other-act evidence must have a nonpropensity hook. The court further acknowledged that, before it could admit the evidence, it had to weigh the probative value against the resulting prejudice. Finally, the court noted

that it is skeptical of Rule 404(b) evidence in general, viewing it "with a jaundiced eye." (R1. 219 at 8.) After all of this, the court decided to admit the evidence.

Would it have been clearer if the court had said, "I find that the evidence is admitted for a nonpropensity purpose," or "I find that any harm in admitting this evidence does not substantially outweigh its probative value"? Perhaps. But given the court's actions and statements combined with the limiting instruction and evidence tutorial given at trial, the court committed no error in admitting the evidence.

B. *Denial of Request to Proceed Pro Se (16-2432)*

In the assault case, as indicated, Mabie proceeded *pro se* for most of pretrial. But eventually, he asked the court to appoint counsel because he needed help reviewing discovery. The court agreed, appointing John Stobbs as counsel.

The case proceeded to trial. Things went smoothly through jury selection and opening statements, but went downhill from there. In the courtroom, before Judge Mills and the jury entered, Mabie got into a fight with Stobbs, causing the deputy marshals to intervene. When the judge entered, Stobbs explained that Mabie wanted to review some documents, but Stobbs told him that there wasn't enough time to do so; consequently, Mabie got into a fighting stance, and the marshals had to remove him from the courtroom. Stobbs concluded by condemning Mabie's behavior, explaining that everyone in the case had worked hard and that he didn't think it was right "for someone to misbehave in Court to get a mistrial because things aren't going the way they think they should." (R2. 100 at 21.)

Although not in the courtroom during the foregoing, Mabie heard all of this discussion by way of a speaker transmitting courtroom sound into his holding cell. When he returned to the courtroom, he demanded to proceed *pro se*. The court denied this request. When Mabie insisted, the court said,

> [Y]ou had too many opportunities and we tried to bend over backwards to accommodate you and all we do is get difficulty. Any time that things aren't going exactly as you want, you throw a tantrum and you fire your counsel and all of this kind of business. No, we have to go. We have to go. No way.

(*Id*. at 36.) Mabie claims that the court erred in rejecting his request to represent himself.

A criminal defendant's right to self-representation, although well-settled, depends on the time that the defendant asserts it. *United States v. Kosmel*, 272 F.3d 501, 505 (7th Cir. 2001). "For example, if a defendant asks to proceed pro se before trial commences, then that request is absolute and must be granted." *Id*. at 505–06. But once trial begins, "the district court retains discretion to balance the interests of the defendant against the potential disruption of the proceedings already in progress." *Id*. at 506.

Here, the court did not abuse its discretion in denying Mabie's request to proceed *pro se*. The court clearly explained its reasoning: Mabie was being disruptive, and the court wanted order in the courtroom. Mabie's disruptive behavior showing his inability to conduct himself in a respectable manner cost him the right to represent himself. Thus, the court committed no error here.

### C. Denial of Mabie's Request to Absent Himself From Trial (16-2432)

In the assault case, even at the start of trial, Mabie was frustrated with the way things were going: he got into a fight with his attorney; the deputy marshals had to remove him from the courtroom; and he heard his attorney speak badly about him. Mabie thus wanted to leave the courtroom and return to his cell. The court denied his request, requiring Mabie to attend trial.

But Mabie was not present at trial for long: as the government's first witness began testifying, Mabie yelled, "You're a piece of shit. Fuck him. Smart mouth maggot mother fucker. Keep that prick away from me." (R2. 100 at 41.) Once again, the deputy marshals had to remove Mabie. But this time, the jury saw everything.

Mabie claims that the court erred in denying his request to leave the courtroom. Mabie further asserts that this error resulted in prejudice: but for the court's error, the jury wouldn't have witnessed Mabie's tirade.

Put aside the fact that any prejudice Mabie suffered was his own doing. Mabie's argument is more deeply flawed than that: his claim of error depends on the assumption that the law *requires* the court to allow a criminal defendant to leave his own trial, which it does not do.

To be sure, the Constitution guarantees a criminal defendant the right *to attend* his trial. *United States v. Smith*, 230 F.3d 300, 309 (7th Cir. 2000). And this right has been codified in the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 43(a). But that does not mean that the reverse is true. Indeed, Mabie has cited no authority suggesting that a defend-

ant has a right *not to attend* his trial. Nor could we find any. In fact, the few cases that have directly addressed this issue have actually suggested that no such right exists. *See, e.g., Copeland v. Walker*, 258 F. Supp. 2d 105, 139 (E.D.N.Y. 2003) (noting that the Supreme Court has never recognized a right of absence); *Sims v. Pfeiffer*, No. LA CV 15-9454 JCG, 2016 WL 6902096, at *3 (C.D. Cal. Nov. 23, 2016) (same). We see no good reason to recognize such a right.

Of course, Mabie is free to try to waive his right to attend trial—as he did. And if the presiding judge so desires, he can excuse Mabie from the courtroom and conduct the trial in Mabie's absence. That said, a criminal defendant has no constitutional right of absence from his own trial. Accordingly, Mabie's claim of error fails.

*D. Sentences Imposed (15-1899 & 16-2432)*

Finally, we address sentencing. Undeniably, Mabie's sentences are lengthy: Judge Reagan in the threat case and Judge Mills in the assault case imposed prison terms of 180 months and 72 months, respectively; and they ran those sentences consecutively to the 88-month Eastern District of Missouri sentence for a total of 340 months' imprisonment. Moreover, both sentences were above the guidelines recommendation, and the one in the threat case was the statutory maximum. Mabie contends that these sentences were substantively unreasonable. We review the reasonableness of a criminal sentence for abuse of discretion. *United States v. Lewis*, 842 F.3d 467, 477 (7th Cir. 2016).

Mabie's primary argument is that both of the sentencing judges considered the assault on Deputy Marshal Berry when imposing sentences on Mabie. Mabie acknowledges

that this does not implicate the Double Jeopardy Clause. *See United States v. Faulkner*, 793 F.3d 752, 756 (7th Cir. 2015). Even so, Mabie claims that it is substantively unreasonable for him to receive two sentences for one act, and moreover, for those sentences to run consecutively to each other. That aside, Mabie also believes that the lengthy prison terms imposed were unwarranted given his crimes. For instance, in the threat case, Mabie notes that there was no evidence that he intended to act on his threats. And in the assault case, Mabie contends that spitting on a law-enforcement officer is the least serious version of an assault.

We disagree. In the threat case, although the assault factored into the sentencing equation, so did many other things. Specifically, the court considered Mabie's "lengthy history of threatening anyone with whom he disagrees," and concluded that "there is clearly no limit to what [Mabie] will say or who he will say it to." (R1. 238 at 15–16.)

The court noted that Mabie wrote numerous letters to Deborah Deeba, whom Mabie had never met, in an effort to harm her husband. Those letters—which include letters actually sent and letters that were addressed but seized before Mabie could send them—are laced with demeaning sexual innuendos and contain recommendations that Deborah and her 11-year-old daughter participate in body-cavity searches.

Mabie also wrote several letters to Judge E. Richard Webber, who presided over Mabie's trial in the Eastern District of Missouri. Throughout those letters, Mabie referred to Judge Webber as "Lefty" because the judge has a prosthetic hand. Mabie also discussed plans to dig up the judge's deceased wife's body to search for evidence that Mabie claimed the judge had hidden there.

But that's not all. While in prison, Mabie sent additional harassing and threatening letters to federal judges, federal prosecutors, FBI agents, postal inspectors, and others.

In one letter, Mabie told Special Agent Cronan, "I can't wait until you make it to St. Louis … so we can be together again. I know your biological clock is ticking, I'm saying I can have you knocked up within the first 25 or 30 boinkings." (R1. 238 at 18.) He signed this letter "XOXO William Mabie." (*Id*.)

In another letter, Mabie said that he would "force feed [some document] down [AUSA] Clark's actual throat-LITERALLY NOT FIGURATIVELY." (*Id*. at 5.)

And in a third letter, Mabie stated, "I am of course going to retrieve [my] property, if it comes to a gunfight, fine … . I know upon release the way to kill a snake is to cut off its head – so … who is the head? AUSA Ware? Follmer? Klein? Deeba? Reisch? Or Judge Webber/former Mrs. Webber?" (*Id*. at 9–10.)

Mabie explained that he sends these letters to try to get people to change their ways; maybe they will find religion, or maybe they will meet Jesus—in person.

During the sentencing hearing, Judge Reagan confronted Mabie with another letter that Mabie had written two weeks earlier. In that letter, Mabie said, "All right, how does this sound? I take [Deputy Marshal Berry] for a ride, meaning tie his nigger ass to the bumper and see what a tough guy he is." (R1. 251 at 103.) Mabie considered this statement to be "completely reasonable" under the circumstances, and refused to disavow it when the court gave him an opportunity

to do so, asserting that he "didn't know [he] had to be politically correct." (*Id*.)

The court considered much more. But this evidence alone proves that the assault on Berry was but a small factor justifying Mabie's 180-month sentence. Moreover, this evidence shows that the sentence imposed was substantively reasonable.

And the same holds true for the sentence in the assault case. There, Judge Mills imposed a 72-month sentence and ran it consecutively to Mabie's other sentences. The court determined that a consecutive sentence was appropriate in light of Mabie's continued threats to kill a deputy United States marshal. For example, at trial, Mabie claimed that, when released, he would "hunt down" Berry, "handcuff him," "beat the shit out of him," and perhaps "just kill the bastard." (R2. 102 at 99–100.) And at sentencing, Mabie promised to "spend the rest of [his] life bringing that lowlife fruit [Berry] to justice." (R2. 130 at 25.) Upon seeing Berry in the courtroom, presumably smiling, Mabie added, "Yeah, sit there and smirk, fruit. When I see you on the street you'll never smirk again. Believe it." (*Id*.)

The court also considered Mabie's free use of racial epithets and other offensive language during trial. For example, during Mabie's *direct* examination, Mabie admitted to making several derogatory comments when assaulting Berry, including calling Berry a "[t]ypical fucking nigger." (R2. 102 at 68.) Mabie also admitted to calling Berry a "bitch." (*Id*. at 88.)

At sentencing, Judge Mills commented that, "after 50 years on the bench, state and federal, I can't say that I recall anyone who was similarly situated to Mr. Mabie in my expe-

rience. Nothing has deterred [Mabie] from continuing and escalating this pattern of threats." (R2. 130 at 36.) Thus, the court imposed a lengthy sentence, expressing the need to protect the public from Mabie.

The record supports Judge Reagan's and Judge Mills's decisions. It appears that no degree of punishment is capable of deterring Mabie's reprehensible conduct. Given all that Mabie has said and done over the past several years, we conclude that Mabie's sentences were substantively reasonable—and deserved.

### III.    CONCLUSION

In the threat case, Judge Reagan committed no error in admitting the Rule 404(b) evidence. In the assault case, Judge Mills committed no error either in denying Mabie's request to proceed *pro se* or in denying Mabie's request to absent himself from trial. And in both cases, Judge Reagan and Judge Mills imposed reasonable sentences. Accordingly, we AFFIRM.